IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TODD ELSTON, | ) | CIVIL DIVISION |
| | ) | |
| Plaintiff, | ) | No.: |
| | ) | |
| vs. | ) | |
| | ) | |
| UPMC - PRESBYTERIAN SHADYSIDE | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendant | ) | |

## COMPLAINT

Plaintiff, Todd Elston, by and through his counsel, Tucker Arensberg, P.C., files the following Complaint against UPMC - Presbyterian Shadyside ("Defendant") and, in support thereof, avers as follows:

## INTRODUCTION

This is an action brought by Mr. Elston seeking legal and equitable relief for race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S. C. §2000 *et seq.*; Pennsylvania Human Relations Act ("PHRA") as amended, 43 Pa.P.S. §951, et seq.

## THE PARTIES

1. Mr. Elston is a black male currently residing at 375 Lime Oak Drive, Pittsburgh, PA 15235.

2. Defendant is a corporation doing business in Pennsylvania, and is engaged in an industry affecting commerce within the meaning of 42 U.S.C. §2000(e) (h) with a place of business located at 200 Lothrop Street, Pittsburgh, PA 15213.

3. This Court has jurisdiction of the claims herein pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. §1988. This civil action arises under the Constitution and laws of the United States. Mr. Elston is alleging a violation of his rights under Title VII of

the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.,* as amended and the Pennsylvania Human Relations Act ("PHRA") as amended, 43 Pa.P.S. §951, et seq. with pendent jurisdiction over state claims.

4. Defendant is an employer within the meaning of §2000(e) (b) of Title VII.

5. Venue resides within the Western District of Pennsylvania since the actions that form the basis of Mr. Elston's Complaint arose in that District.

6. On or about August 19, 2005, Mr. Elston filed charges of race discrimination and retaliation against Defendant with the Equal Employment Opportunity Commission (hereinafter referred to as "EEOC"). A copy of EEOC Charge No. 172-2005-01248 is attached hereto as Exhibit "A."

7. On or about January 31, 2006, the EEOC issued a ninety (90) day Right to Sue Notice regarding EEOC Charge No. 172-2005-01248. A copy of the Notice is attached hereto as Exhibit "B."

## STATEMENT OF FACTS

8. On or about August 13, 1984, Mr. Elston began working for UPMC/Presbyterian/Shadyside as a housekeeper.

9. Sometime in 1994, Mr. Elston was promoted to Storeroom Clerk and, in 1995, he became an Inventory Control Analyst which was a lateral move.

10. In February 1999, Mr. Elston was promoted to Coordinator - Environmental Support Services.

11. In July 1999, Mr. Elston was promoted to Housekeeping Coordinator for the Environmental Support Services Department at $40,768 annually and, he began reporting to Drew Chidester.

12. In 2001, Mr. Chidester transferred to Shadyside Hospital at which time Mr. Elston began reporting to Ed Dudek (white male) who was promoted to Director, Engineering and Maintenance.

13. On January 16, 2003, Mr. Elston was promoted to Manger, of Engineering and Maintenance.

14. In the summer of 2004, Bill Warren (black male, Project Leader in Engineering and Maintenance) met with Ed Dudek to inform him that people were approaching him inside and outside of the UPMC system regarding minorities not getting opportunities to work in the Maintenance Department.

15. The following day Mr. Dudek invited Mr. Elston to his office to discuss what Bill Warren had informed him and to ask Mr. Elston's opinion regarding the issue.

16. Mr. Elston told Mr. Dudek that he was aware of the situation and, that, Mr. Warren and he have had many conversations about minorities not getting opportunities to work in the Maintenance Department.

17. Mr. Dudek told Mr. Elston that he thought about it after talking to Mr. Warren, he decided to email Eric Conti (Director Human Resources) about Mr. Warren's concerns.

18. Mr. Dudek thereafter asked Mr. Elston if he would sit on a committee to recruit minorities in the department to which Mr. Elston immediately agreed to do, however, Mr. Warren was not asked to be a member of the committee.

20. Mr. Elston believes Mr. Warren was not asked to be a member of the committee because Mr. Dudek resented the fact that Mr. Warren had brought the minority issue to his attention.

21. Mr. Dudek told Mr. Elston that he wanted to include some people he personally met while attending Pitt on the committee.

22. Mr. Dudek therefore called Dr. Leon Haley who was his former professor in graduate school and arranged for Mr. Elston and Dr. Haley to meet.

23. During Mr. Elston's meeting with Dr. Haley, Dr. Haley suggested that Mr. Dudek advertise his job vacancies in the local black churches, newspaper and radio.

24. At the time they were discussing recruitment, Mr. Dudek had several stationary engineer positions available and one electrician position.

25. Mr. Elston therefore took the initiative to contact the local technical institutes and Job Placement Coordinators to make them aware of Defendant's new minority recruitment efforts and, they immediately began sending Mr. Elston resumes' of minority applicants.

26. Mr. Elston gave the resumes' to Mr. Dudek who did absolutely nothing with them.

27. As a result, the Placement Coordinators began calling and emailing Mr. Elston about their minority recruitment program and, therefore, Mr. Elston asked Mr. Dudek what was going on to which Mr. Dudek responded that, "Things are on hold".

28. Jaime Sebastionelli (white female, Mr. Dudek's Secretary) was aware that Mr. Dudek and Mr. Elston were engaged in an effort to recruit more minorities into the department so, when she learned that there was a lecture on how blacks were being kept out of the building trades, she told Mr. Dudek about the lecture and put it on his calendar so that he could attend.

29. Both Mr. Dudek and Mr. Elston attended the lecture during which Mr. Dudek took offense to what the lecturer was saying and, he even challenged her on a few items.

30. For instance, Mr. Dudek stated that the lecturer's data was "white male bashing." At that point, he got up and went and stood in the back of the room.

4

31. As Mr. Elston and Mr. Dudek were walking back from the lecture, Mr. Dudek stated that she had no real solutions and all she did was bash the white male.

32. Mr. Dudek then stated that he did not believe a company should be penalized for not hiring minorities. Mr. Elston responded that that is the only way some companies will hire minorities. At which point Mr. Dudek responded that "if a company sees that a minority brings quality to the workforce then they would begin to hire minorities without it being mandated."

33. The only minorities hired under Mr. Dudek after he was promoted to Director of the Engineering in the Maintenance Department was Jamir Acie who Mr. Elston hired as a General Maintenance worker.

34. Mr. Acie was a qualified Stationary Engineer who worked as a temp for Pitt, however, Mr. Dudek did not feel he was qualified to be a Stationary Engineer and Mr. Acie had to apply for the position three times before he was finally hired.

35. On another occasion, Mr. Elston interviewed Douglass Webster, a minority candidate for a vacant General Maintenance position that was created when a friend of Mr. Dudek moved from a General Maintenance position to a higher paying journeyman's position.

36. Mr. Webster was a graduate of Triangle Tech and had the requisite experience for the job. He was on the Dean's list and was student of the month at Triangle Tech.

37. Mr. Elston and Ed Weimer (Supervisor who assisted Mr. Elston with the interview process) both felt that Mr. Webster was perfect for the position and, therefore, Mr. Elston referred Mr. Webster to Ron Abels (Human Resources) for an interview after which Mr. Abels also found him to be qualified for the position.

38. Mr. Webster's last interview was with Mr. Dudek for final approval, however, after he interviewed Mr. Webster, Mr. Dudek withdrew the position and Mr. Webster was never hired.

39. Mr. Elston believes Mr. Dudek did not want to hire a black male for that position because he stated that we should "grow-our-own" in reference to recruiting minorities. Mr. Dudek explained that he would rather not hire blacks off the street but develop them from within the system -- which has never been the procedure for the hiring of non-minorities.

40. Mr. Dudek was clearly opposed to hiring minorities because he also stated that "it is difficult to terminate them [blacks] if they did not work out."

41. When Bill Warren and Mr. Elston asked why things were moving so slow with hiring minorities, Mr. Dudek responded that he was getting support from Jim Terwilliger but the other people in UPMC senior administration did not support his efforts to recruit minorities in the department.

42. Messrs. Elston and Warren therefore asked Mr. Dudek if they could meet with the UPMC senior administration and express their concerns about hiring minorities.

43. Mr. Dudek denied their request stating that he would carry their message to the UPMC senior administration.

44. Mr. Elston did not believe Mr. Dudek was going to discuss the minority hiring issue with the UPMC senior administration because Mr. Dudek had stated on two separate occasions that "the minority-hiring situation is like baseball. It remained segregated until the owners discovered that there was a financial advantage to allowing blacks to play in the major leagues. He said it was the same way with UPMC. There has to be something in it for them."

45. Mr. Dudek further stated that he had a better chance of getting their support if he created a program that made the administration look good as whole.

6

46. Mr. Dudek also told Mr. Warren that it was difficult to recruit with a racist recruiter like Ron Abels doing the recruiting.

47. In the mist of all this, Mr. Elston had an issue with being paid less than his white counterparts who in fact had lesser responsibilities and job duties than him.

48. Mr. Elston expressed his concern to Mr. Dudek who thereafter sent an email to Eric Conti (Human Resources) and requested that Mr. Conti review Mr. Elston's compensation and give him an increase based on his work performance, responsibilities and that fact that Mr. Elston was making less than the other supervisors and substantially less that the other managers who reported to Mr. Dudek. Mr. Dudek also stated in his email that Mr. Elston was his only minority manager.

49. After reviewing the email, Mr. Conti agreed that Mr. Elston should receive a pay increase and, therefore he approved the increase.

50. However, because of Mr. Elston's complaints regarding the lack of support for minority recruitment in his department, Mr. Dudek retaliated against Mr. Elston by delaying his salary increase for six months.

51. Mr. Dudek also retaliated against Mr. Elston by taking away his secretary which made it nearly impossible for him to manage his department.

52. Moreover, even with the salary increase, Mr. Elston was still being paid substantially less than his white counterparts while performing much greater job responsibilities than they did.

53. Mr. Elston had received excellent performance evaluations throughout his employment.

54. On December 4, 2004, Mr. Elston met with Mike Payne (Human Resources Representative) and complained about the discriminatory and retaliatory treatment that Mr. Dudek was subjecting him to.

55. During that meeting, Mr. Payne told Mr. Elston that he had a lot of time at UPMC and, that, he should consider his family situation. Mr. Payne told Mr. Elston that he did not need the added stress with his son being in Iraq and, that, he should give it some time and try transferring to another department if I could not work things out with Mr. Dudek.

56. Mr. Elston and Mr. Warren also complained to J.W. Wallace (Diversity Senior Director) about Mr. Dudek's discriminatory hiring practices.

57. For instance, when Lou Mobley (black electrician) retired, Mr. Dudek said that he would replace Mr. Mobley with a minority. Mr. Elston therefore gave Mr. Dudek a resume for a black female electrician who had excellent qualifications. Mr. Dudek called her in for an interview, but would not allow Mr. Elston or Mr. Warren to attend the interview. After interviewing her, he took the position that she was not qualified and hired a white male for the position.

58. Mr. Wallace thereafter scheduled a meeting with Mr. Elston and Mr. Dudek to discuss all of the issues that concerned Mr. Elston.

59. Mr. Dudek was not receptive to this meeting and, he told Mr. Wallace that by Mr. Elston getting him involved, that he viewed that as being tantamount to "ringing a racial bell that could not be un-rung."

60. Mr. Dudek then went as far as to accuse Mr. Elston of tarnishing his reputation with his superiors.

61. Mr. Elston continued to complain about Mr. Dudek's discriminatory treatment, practices and retaliation by requesting a meeting with James Terwilliger (Vice President of Operations and Mr. Dudek's boss).

62. During his meeting with Mr. Terwilliger, Mr. Elston told him that he was taking medication for stress, anxiety and depression due to the discriminatory and retaliatory treatment.

8

63. Mr. Elston also told Mr. Terwilliger about his meetings with Ed McGinley (Director, Employee Relations) and J.W. Wallace to which Mr. Terwilliger responded in an angry voice that it was not an Ed McGinley-J.W. Wallace issue.

64. A week later, Mr. Terwilliger met with Mr. Elston and Mr. Dudek during which he down played Mr. Elston's complaints as being a mere miscommunication and suggested that Mr. Elston take a week off, with pay, to relax and think about if he could continue to work with Mr. Dudek. However, Mr. Elston declined his offer to take the week off.

65. On April 5, 2005, Mr. Elston once again complained to Ed McGinley about the discriminatory and retaliatory treatment he was experiencing. Mr. McGinley asked Mr. Elston if he thought it was because of his race and Mr. Elston told him that he did at which time Mr. McGinley responded that, "You should hang in there because 20 years is a lot to give up by resigning."

66. On April 7, 2005, as Mr. Dudek was getting ready to leave for the day, Mr. Elston asked if he had a minute to speak to him before he left and Mr. Dudek said sure.

67. Mr. Elston therefore went back to his office and got a stack of documents that were correspondence between Rebekah Johnston (his Administrative Assistant) and Mr. Elston to give to Mr. Dudek.

68. Mr. Elston was trying to convince Mr. Dudek of how important Ms. Johnston's position was and how it would impact his operation if he eliminated her position.

69. Mr. Dudek thumbed through the stack of emails and said he probably will not read all of them and laughed.

70. Mr. Elston then asked Mr. Dudek if he would consider John Jones (black male) for the Facilities Coordinator position that was left vacant when Maureen

9

Sansonetti resigned. Mr. Dudek responded that he was giving that position to Judy Reed (white female).

71. Mr. Elston therefore asked Mr. Dudek if he would consider any of his requests because without any assistance he would not be able to perform his duties and, therefore he would have to tell Jim Terwilliger that he could no longer work in that capacity. Mr. Dudek simply responded, "If that's your decision." At that point, Mr. Elston picked up the emails and left Mr. Dudek's office.

72. Mr. Elston decided to go and discuss the matter with Jim Terwilliger. While enroute to Mr. Terwilliger's office, Mr. Elston ran into Mr. Dudek who was on his way to his vehicle. As Mr. Elston walked with Mr. Dudek, he told Mr. Dudek that people were saying that he showed favoritism towards people he liked and no one else mattered.

73. At that point, Mr. Elston decided that it was wise not to barge into Mr. Terwilliger's office so he called Mr. Terwilliger's secretary and asked to speak with him. She told Mr. Elston that Mr. Terwilliger was attending a meeting at Shadyside Hospital and she did not expect him to return to the office that day.

74. Later the evening of April 7, 2005, Mr. Terwilliger called Mr. Elston at home and stated that the situation was getting out control and, that, Mr. Elston was suspended with pay pending an investigation for an incident involving Mr. Dudek earlier that day. However, he would not go into any detail at that time.

75. Mr. Elston was totally shocked by this because he had not done anything wrong.

76. Mr. Elston was unable to determine what he allegedly did wrong to justify his termination until some eight weeks later.

77. On June 3, 2005, Mr. Elston met with Mike Payne and Ed McGinley. During that meeting, they told Mr. Elston that he was being terminated because of what

10

they viewed on the April 7, 2005 surveillance tape. However, they did not go into any detail and Mr. Elston was never given an opportunity to review the surveillance tape.

78. After terminating Mr. Elston, Defendant offered him 16 weeks severance pay in exchange for him signing a Separation Agreement and General Release which he refused to sign.

## COUNT I
## RACE DISCRIMINATION IN VIOLATION OF TITLE VII

79. Mr. Elston incorporates herein by reference paragraphs 1 through 78 of this Complaint.

80. Mr. Elston always performed his job duties in a satisfactory manner.

81. Defendant discriminated against Mr. Elson on the basis of his race by paying his white counterparts more than him despite the fact that Mr. Elson performed substantially greater job duties than them.

82. Defendant has engaged in a pattern and practice of discriminating against blacks in the hiring, promoting, terms and conditions of employment.

83. As a result of the acts of race discrimination, Mr. Elston suffered and continues to suffer emotional harm and harm to his reputation.

84. Defendant's acts of discrimination were performed with malice and reckless indifference to Mr. Elston's protected civil rights.

WHEREFORE, Mr. Elston respectfully requests this Honorable Court to award him the following:

    a. All the pay and fringe benefits he has lost as a result of Defendant's unlawful discrimination against him;

    b. Reinstatement or front pay;

    c. Compensatory and punitive damages;
    d. Interest on all amounts awarded;

    e.    A permanent injunction prohibiting Defendant from engaging in any further conduct which would violate the Mr. Elston's rights under Title VII of the Civil Rights At of 1964, as amended;

    f.    Reasonable attorneys' fees and costs together with any reasonable expert witness fees;

    g.    Such other and further relief as this Court deems just and proper.

## COUNT II
## RETALIATION IN VIOLATION OF TITLE VII

85.    Mr. Elston incorporates herein by reference paragraphs 1 through 85 of this Complaint.

86.    Defendant retaliated against Mr. Elston for complaining about Defendant's acts of discrimination.

87.    Mr. Elston is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's retaliatory practices.

WHEREFORE, Mr. Elston respectfully requests this Honorable Court to award him the following:

    a.    All the pay and fringe benefits he has lost as a result of Defendant's unlawful discrimination against him;

    b.    Reinstatement or front pay;

    c.    Compensatory and punitive damages;

    d.    Interest on all amounts awarded;

    e.    A permanent injunction prohibiting Defendant from engaging in any further conduct which would violate the Mr. Elston's rights under Title VII of the Civil Rights At of 1964, as amended;

    f.    Reasonable attorneys' fees and costs together with any reasonable expert witness fees;

    g.    Such other and further relief as this Court deems just and proper.

## COUNT III

### Race Discrimination and Retaliation Pursuant to
### the Pennsylvania Human Relations Act

88. Mr. Elston incorporates herein by reference paragraphs 1 through 87 of this Complaint.

89. At all times relevant hereto, Defendant has engaged in race discrimination and retaliation in violation of the Pennsylvania Human Relations Act.

WHEREFORE, Mr. Elston respectfully requests this Honorable Court to award him the following:

a. All the pay and fringe benefits he has lost as a result of Defendant's unlawful discrimination against him;

b. Reinstatement or front pay;

c. Compensatory and punitive damages;

d. Interest on all amounts awarded;

e. A permanent injunction prohibiting Defendant from engaging in any further conduct which would violate the Mr. Elston's rights under Title VII of the Civil Rights At of 1964, as amended;

f. Reasonable attorneys' fees and costs together with any reasonable expert witness fees;

g. Such other and further relief as this Court deems just and proper.

Respectfully submitted,

TUCKER ARENSBERG, P.C.

Date: March 13, 2006

By  s/ *Homer L. Walton*

Homer L. Walton, Esquire
PA ID No.: 55415
Fred Wolfe, Esquire
PA ID No: 56865
1500 One PPG Place
Pittsburgh, PA 15222
(412) 594-5657
**JURY TRIAL DEMANDED**

LIT:387002-1 022449-123787

13