IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TODD ELSTON, | ) | |
| | ) | |
| Plaintiff, | ) | 2:06-cv-329 |
| v. | ) | |
| | ) | |
| | ) | |
| UPMC-PRESBYTERIAN SHADYSIDE, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM ORDER**

Pending before the Court is Defendant's MOTION FOR SUMMARY JUDGMENT (Document No. 16). The matter has been thoroughly briefed (Document Nos. 17, 25, 28) and is ripe for disposition.

Factual and Procedural Background

Todd Elston began working for UPMC in 1984 as a housekeeper. He received several promotions and in January 2003, he was promoted to Manager of Engineering and Maintenance, reporting to Ed Dudek. Dudek considered Elston to be a good manager with tremendous potential. Dudek and Elston also displayed a personal friendship while at work, although that relationship deteriorated beginning in late 2004. In the summer of 2004, Bill Warren approached Dudek about improving opportunities for minorities to work in the UPMC maintenance department. Dudek asked Elston to participate on a recruitment committee. Warren and Elston subsequently asked Dudek why minority hiring was moving so slowly and asked if they could meet with UPMC senior executives. Dudek declined their request. Elston eventually came to believe, from several statements Dudek made, that Dudek was opposed to hiring minority workers.[1] Dudek favored creation of a minority apprentice program, which Elston opposed.

---

[1] Some of the comments, listed in Plaintiff's Brief at 5-6, appear to be philosophical or political in nature. Others, though, appear to be directly related to the UPMC workforce, such as: "It is difficult to terminate them [blacks] if they do not work out"; and a discussion with Robert Grzywinski in which Dudek stated that he did not like blacks, called them "tokens," and said that

In October 2004, Elston complained to Dudek about being paid less than his white counterparts. On October 8, 2004, Dudek sent an email to Eric Conti in human resources, strongly advocating on Elston's behalf. Conti approved the increase. However, there was a communications glitch and Elston's raise was not processed. Elston believes that Dudek intentionally delayed processing it in retaliation for their disagreements regarding minority recruiting. On several occasions, Elston told Marilyn Suschak, the office manager, that he had not yet received the raise, and each time, Suschak stated that she would tell Dudek. Finally, in March 2005, Elston raised the issue with Dudek directly. Dudek immediately contacted human resources and had the raise processed, retroactive to October 2004, although the raise was not reflected in his paycheck until April 2005.

On December 3, 2004, Elston and Dudek attended a seminar entitled *Race: The Invisible Hand – How White Networks Exclude Black Men from Blue-Collar Jobs*. While walking back from the lecture, Elston and Dudek engaged in a loud, heated and spirited disagreement regarding the content of the seminar and the implementation of the minority recruitment program at UPMC. A secretary, Jamie Sebastianelli, also attended the seminar and witnessed the loud discussion. Neither participant was disciplined.

On December 10, 2004, Elston sent Dudek an email to request a meeting with Mike Payne, Senior HR Consultant, to explore a transfer to another job within UPMC. On December 14, 2004, Dudek sent an email to Payne, relating that Elston had had an extreme and emotional reaction to a reassignment of clerical support, theorized that Elston was under extreme stress because his son was a marine stationed in Iraq, and suggested that Elston may need help from the employee assistance program. On December 20, 2007, Elston met with Payne and complained about Dudek. Payne's notes from the meeting reflect that Elston was burned out and that his relationship with Dudek was "down the tubes."

---

he was going to hold blacks to a higher standard than the best guy in the department. Grzywinski Dep. at 19. UPMC seeks to avoid this testimony by asserting that the statements were made well after Elston was terminated. However, Grzywinski testified that "Todd [Elston] was still working there then." Grzywinski Dep. at 17, 49.

On February 22, 2005, Dudek performed Elston's annual performance review. The overall ranking was 2.4, which was lower than in the prior three years and resulted in a 3% merit increase. On February 23, 2005, Elston sent an email to Dudek seeking to have senior UPMC executives attend a meeting with Payne to discuss his review. This touched off a flurry of emails between Dudek, Payne and Terwilliger and Elston which culminated with Elston stating "before I allow myself to be humiliated I will go [to] the EEOC for advice and representation."

On March 1, 2005, Dudek emailed Payne and Jim Terwilliger, explaining that he believed the source of Elston's perception that he was being treated unfairly dated back to the October, 2004 request for a pay raise and that Elston deduced that Dudek had stopped the raise in retaliation for their disagreements about minority recruitment.

In early 2005, Elston met with Bill Warren and JW Wallace, Senior Director of UPMC's Office of Diversity to discuss recruiting and Dudek. In March 2005, Wallace scheduled a meeting with Dudek. The parties disagree regarding Dudek's receptivity to this meeting. Plaintiff contends that Dudek viewed Wallace's involvement as tantamount to "ringing a racial bell that could not be un-rung" and was concerned that his reputation would be tarnished. Subsequently, Dudek expressed these sentiments in a one-on-one meeting with Wallace.

On March 29, 2005, Dudek sent another email to Payne, to report on additional argumentative encounters with Elston. On March 31, 2005, Dudek sent another email to Payne, to inform him that Elston had walked out of a meeting regarding administrative assignments and then stated that he was filing discrimination and retaliation charges that day. On April 5, 2005, Elston met with Ed McGinley, Director of Employee Relations and in-house counsel, regarding the alleged discrimination. On April 6, 2005, Jim Terwilliger, Vice President of Operations, met with Elston and Dudek, suggested that there was a personality conflict and asked Elston take a week off, with pay, to consider whether he could work with Dudek.

On April 7, 2005, an incident occurred which UPMC cites as the basis for its decision to terminate Elston (the "April 7 Incident"). At the end of the workday, Elston gave a stack of emails to Dudek to demonstrate how important it was for him to have Rebecca Johnston as an administrative assistant. Elston stated that without her, he would tell Jim Terwilliger that he

3

could no longer work there. Dudek simply responded: "If that's your decision." The two men parted, and then left the building at approximately the same time. Their encounter on the steps of the building was captured on videotape.[2] Pursuant to Elston's written description of the incident, he was walking beside Dudek and told Dudek that he showed favoritism, had forgotten where he came from, and made Elston "feel like an outside Negro." According to Dudek's written report, he "had a very confrontational incident with Todd that ended with him being very aggressive, verbally abusive, physically threatening and extremely inappropriate." Dudek described Elston as blocking the path, shouting obscenities and waving his finger in Dudek's face.[3]

Immediately after the encounter, both men attempted to contact Jim Terwilliger, who was unavailable. Dudek also called Bruce Nagle, Vice President of Human Resources, Payne and McGinley. Later, Terwilliger called Elston at home and told him that he was suspended, with pay, pending an investigation of the incident.

Michael Payne conducted the investigation. In addition to the statements from Elston and Dudek, he interviewed each of them, and others, and obtained a statement from Jamie Sebastionelli. Payne also reviewed the video, with Dudek providing commentary. On April 28, 2005, Payne submitted his report. The first two pages listed issues that Elston identified as contributing to the confrontation, with a column containing Elston's position and a column entitled "Response." The summary states: "The video appears to show that Todd was confrontational and aggressive in his demeanor." Elston disagrees with Payne's assessment. Payne expressed his concern that Elston had publicly displayed insubordiantion and recommended: "We need to discuss next steps as a group; however, I believe that we are left with no option but to terminate Todd Elston's employment." On April 12, 2005, Dudek sent an email to Terwilliger, stating in essence that Elston's complaints were meritless and that he had

---

[2]This video has not been provided to the Court. The still photos contained in Plaintiff's appendix are indecipherable.

[3]Elston at first denied waving his finger, but after his wife informed him that he sometimes points his finger while talking, he sent an explanatory email to Payne.

tolerated the insubordination and volatile behavior for a long time. Dudek also stated: "Thanks for supporting me on this. I really do appreciate it."

Payne then met with Terwilliger, McGinley and Louis Goodman, Vice President of Human Resources.[4] After discussion, the group decided to offer Elston a severance package. On June 3, 2005, Payne and McGinley met with Elston, informed him that he was being terminated for insubordination due to the April 7 Incident, presented the severance package, and demanded a response within seven days. When Elston did not accept the severance package, Payne sent a letter of termination dated June 3, 2005. Elston denies receiving this letter.

Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure reads, in pertinent part, as follows:

> [Summary Judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

In interpreting Rule 56(c), the United States Supreme Court has stated:

> The plain language . . . mandates entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).

An issue of material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must view the facts in a light most favorable to the non-moving party, and the burden of establishing that no genuine issue of material fact exists rests with the movant. *Celotex*, 477 U.S. at 323. The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against the moving party." *Ely v. Hall's Motor Transit Co.*, 590 F.2d 62, 66 (3d Cir. 1978) (*quoting Smith v. Pittsburgh*

---

[4]Goodman had replaced Bruce Nagle. UPMC's discovery responses are consistent.

*Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972)).  Final credibility determinations on material issues cannot be made in the context of a motion for summary judgment, nor can the district court weigh the evidence.  *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632 (3d Cir. 1993); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224 (3d Cir. 1993).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' -- that is, pointing out to the District Court -- that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325.  If the moving party has carried this burden, the burden shifts to the non-moving party, who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Petruzzi's IGA Supermarkets*, 998 F.2d at 1230.  When the non-moving party's evidence in opposition to a properly supported motion for summary judgment is "merely colorable" or "not significantly probative," the court may grant summary judgment.  *Anderson*, 477 U.S. at 249-250.

Legal Analysis

    1.    Wrongful Discharge

Count One of the Complaint asserts a claim for Race Discrimination in Violation of Title VII.  The relevant portion of Title VII provides:

> **§ 2000e-2.  Unlawful employment practices**
>
> **(a) Employer practices.**  It shall be an unlawful employment practice for an employer--
>> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).  In order to establish a *prima facie* case of race discrimination under

Title VII with respect to his discharge, Elston must show that: (1) he was a member of a protected class; (2) he was qualified for the position; (3) he was discharged; and (4) under circumstances giving rise to an inference of discrimination. *Sarullo v. United States Postal Service*, 352 F.3d 789, 797 (3d Cir. 2003). The Court must evaluate whether Elston was terminated due to his race, not whether the employer's decision was "wise, shrewd, prudent or competent." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). Plaintiff's PHRA claim is interpreted under the same standard. *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996).

Defendant contends that the only decision-makers were McGinley, Payne and Terwilliger and that their asserted non-discriminatory reason for the discharge, i.e., the April 7 Incident, was not pretextual. Defendant further argues that Elston cannot establish the fourth prong of the prima facie case because he has not come forward with any white employees who were treated more favorably. Plaintiff contends that Dudek was also involved in the decision to terminate him and that there is "direct evidence" that he was terminated due to his race. Plaintiff further responds that there are two white comparators, Jamie Sebastianelli and George Lesick, who engaged in insubordinate conduct for which they were not terminated. The Court will address these arguments seriatim.

        A.     Subordinate Bias Theory

The initial issue the Court must resolve is whether Dudek can be considered to be a decision-maker. Elston challenges UPMC's position that the only McGinley, Payne and Terwilliger made the decision to terminate him, and contends that Dudek also was involved in the decision. The "subordinate bias" theory has been recognized by all the circuit courts that have considered the issue, but a circuit split exists as to the proper standard for applying the "subordinate bias" theory to the facts. *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476 (10th Cir. 2006), *cert. dismissed* 127 S. Ct. 1931 (2007) ("*BCI*"), contains the most extensive discussion of the "subordinate bias" theory. Two analogies have been used to describe the theory. The term "cat's paw" involves a situation in which an allegedly biased subordinate who lacks decision-making authority "uses the formal decisionmaker as a dupe in a deliberate

7

scheme to trigger a discriminatory employment action." *Id.* at 484. The term "rubber stamp" refers to a situation in which a decisionmaker "gives perfunctory approval for an adverse employment action explicitly recommended by a biased subordinate."[5] *Id.* In either scenario, an employer may be held liable for a subordinate's prejudice even if the decisionmaker lacked discriminatory intent. *Id.* at 485.

The circuit courts have applied at least three distinct approaches in implementing the "subordinate bias" theory. At one end of the spectrum, in *Dey v. Colt Constr. & Devp. Co.*, 28 F.3d 1446 (7th Cir. 1994), the Seventh Circuit stated that summary judgment would not be proper "where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that **may have affected** the adverse employment action." *Id.* at 1459 (emphasis added); *see also Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2000) (plaintiff must show that discriminatory had "influence or leverage over the official decisionmaker"). At the other extreme, the Fourth Circuit concluded in *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277 (4th Cir. 2004) (en banc), that an employer cannot be held liable even if the biased subordinate exercises "substantial influence" or plays a "significant" role in the decision. Instead, a plaintiff must prove that "the subordinate **is the actual decisionmaker**." *Id.* at 290-91 (emphasis added). In *BCI*, the Tenth Circuit adopted a middle ground test: "whether the biased subordinate's discriminatory reports, recommendation, or other actions **caused** the adverse employment action." 450 F.3d at 487 (emphasis added).

The Third Circuit has adopted a standard toward the more lenient end of the spectrum. In *Abramson v. William Patterson College of New Jersey*, 260 F.3d 265 (3d Cir. 2001), the Court held: "it is sufficient if those exhibiting discriminatory animus **influenced or participated in the decision to terminate**." *Id.* at 286 (emphasis added). In *Abramson*, the Court cited *Roebuck v. Drexel University*, 852 F.2d 715, 727 (3d Cir. 1988), for the proposition that a jury might permissibly conclude that a discriminatory evaluation at any level influenced the decisionmaking process and thus allowed discrimination to infect the ultimate decision. 260 F.3d at 286. In

---

[5]Because Payne conducted an independent investigation, there was no "rubber stamp."

*Abramson*, the Court reversed a grant of summary judgment because two subordinates displaying discriminatory animus "played a role" in the decision. In *Foster v. New Castle Area School Dist.*, 98 Fed. Appx. 85 (3d Cir. 2004), a more recent Third Circuit case, the panel found the Fourth Circuit's analysis in *Hill* to be "both applicable to this case and persuasive." 98 Fed. Appx. at 88. In *Foster*, the Court held that an employer would not be liable for an improperly motivated person "who merely influences the decision," but only for the actual decisionmaker. *See also Russ-Tobias v. Pennsylvania Board of Probation and Parole*, 2006 WL 516771 *26-27 (E.D. Pa. March 2, 2006) (citing *Foster* and *Hill* and applying "actual decisionmaker" test). The Court recognizes the conflict between *Foster* and *Abramson*. However, *Foster* is a non-precedential opinion and the Court is bound to follow *Abramson*.

Applying the *Abramson* standard to the facts of this case, it is apparent that Dudek must be considered to be among the decision-makers. There is substantial evidence that Dudek participated in the investigation of the incident. He submitted a statement and provided oral commentary on the videotape of the April 7 Incident to Payne. Elston, who was not given an opportunity to provide commentary on the videotape, disputes Dudek's description of the incident. Terwilliger stated that he was the ultimate decision-maker, but that he had Dudek's input with regard to that decision. Terwilliger Dep. at 27. In his April 12, 2005 email to Terwilliger, Dudek stated: "Thanks for supporting me on this. I really do appreciate it." In sum, a reasonable jury could conclude that Dudek influenced or participated in the decision to terminate Elston. Accordingly, in analyzing the alleged "direct evidence" and the prima facie case, the Court will assume that Dudek was also a decision-maker.

                B.      Direct Evidence

The familiar *McDonnell Douglas* burden-shifting framework does not apply if there is direct evidence of discrimination. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002). "Direct evidence" is evidence that is "so revealing of discriminatory animus that it is not necessary to rely on any presumption from the *prima facie* case to shift the burden of production." *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096 n. 4 (3d Cir. 1995). In

cases in which direct evidence of discrimination is presented, there is no need for an "inference" of discrimination, since the discrimination itself is transparent. The Court quoted Justice O'Connor:

> [S]tray remarks in the workplace, while perhaps probative of [a discriminatory animus], cannot justify requiring the employer to prove that its [employment] decisions were based on legitimate criteria. Nor can statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard; ... What is required is ... direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision.

*Price Waterhouse*, 490 U.S. at 277 (O'Connor, J., concurring).

Plaintiff contends that Dudek made numerous comments that, in his view, "are unquestionably revealing of discriminatory animus," i.e.:

"It is difficult to terminate them [blacks] if they do not work out."

"I do not believe a company should be penalized for not hiring minorities."

"If a company sees that a minority brings quality to the workforce then they would begin to hire minorities without it being mandated."

"Once someone casts doubt on my integrity, [as Elston did] I feel the need to address it forcefully. I'm still pretty pissed."

"I heard you met with two of my black managers."

"I view this as 'ringing a racial bell that could not be un-rung.'" [regarding Elston notifying the UPMC Office of Diversity.]

Dudek stated that he did not like blacks and viewed them as tokens.

Dudek stated that he was going to hold a black man to a higher standard than the best employee in the department.

"The minority-hiring situation is like baseball. It remained segregated until the owners discovered that there was a financial advantage to allowing blacks to play in the major leagues. It is the same way at UPMC. There has to be something in it for them."

"We should grow our own." [referencing recruitment of minorities and development of an apprentice program.]

Given the circumstances of this case, and the entire factual record, these statements – either individually or in toto – do not amount to "direct evidence" that Elston was terminated due to his race. Certainly, the comments cited by Elston have racial overtones, but that is hardly surprising in that many of the comments occurred after attending a presentation

about minority hiring or in the context of Elston's and Dudek's minority recruitment efforts. None of the statements was made at the time of, or in connection with, Elston's termination. The comments could be considered in determining whether UPMC's stated reason for the discharge was pretextual, if the Court reaches that issue.[6] However, these comments do not so clearly establish that UPMC placed substantial negative reliance on Elston's race as to render the *McDonnell Douglas* burden-shifting framework inapplicable.

          C.      Comparators/Prima Facie Case

Plaintiff contends that white employees have committed similar insubordinate conduct and not been terminated. Defendant correctly points out that to be a valid comparator, the co-worker must have been disciplined by the same decision-maker. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000) (*cited in Goins v. Echostar Communications Corp.*, 148 Fed Appx. 96, 98 (3d Cir.2005)); *see also Coulton v. University of Pennsylvania*, 2006 WL 759701 *7 n.3 (E.D. Pa. 2006) (decisions made by different supervisors seldom raise an inference of discrimination because supervisors may exercise their discretion differently). For the reasons set forth above, the Court will assume that the relevant decision-makers include Dudek.

Specifically, Plaintiff points to Jamie Sebastianelli and George Lesick as comparators. UPMC contends, as an initial matter, that Elston's alleged comparators are invalid because managers are held to a higher standard than staff. Elston agrees that no manager has ever been fired for insubordination, but disputes the idea that this labor/management distinction invalidates the comparison. The Court agrees with Elston. UPMC cited to the Policy and Procedure applying to "all non-supervisory, non-management staff members" regarding insubordination as

---

[6]Some of the comments appear to be philosophical or political in nature. Others, though, appear to be directly related to the UPMC workforce. UPMC contends that the comments Grzywinski related were made long after Elston was terminated. However, Grzywinski testified that they occurred while "Todd was still working there then." Grzywinski Dep. at 17. At a minimum, there is a material dispute of fact regarding the timing of said remarks.

the basis for the termination and attached that policy to Elston's termination letter. UPMC cannot argue that the policy applies equally to both staff and management for discipline but not for analyzing potential comparators.

Defendant also argues that Sebastianelli and Lesick are not truly comparable. There was one instance in which Sebastianelli, a secretary, ignored the office manager's invitation to discuss a matter and instead went outside to smoke a cigarette. Sebastianelli received a written reprimand. This incident does not suffice to raise an inference that Elston's termination was due to race discrimination. The insubordination was not exhibited toward Dudek and the passive disobedience displayed by Sebastianelli could legitimately have been viewed by UPMC as far less serious than the aggressive, threatening behavior which UPMC concluded had been exhibited by Elston toward Dudek.[7] Moreover, Sebastianelli apparently engaged in a single incident, while Dudek had complained about an escalating series of confrontations with Elston in the weeks preceding his termination.[8] In addition, the existence of the video made Elston's actions directly observable by the human resources and executive level employees who were the ultimate decision-makers.

The only other comparator proffered by Plaintiff is George Lesick. Elston cites to an incident described by Robert Grzywinski in which Lesick pointed at Grzywinski, started swearing, and then left the room. Grzywinski gave Lesick a few hours to cool down, made him apologize to the other two employees who were present and then let the matter drop. The record reflects that Grzywinski told Joe Crouse about the incident, but not Dudek. Grzywinski Dep. at 27-30. This does not raise an inference of discrimination as to Elston's termination. The direct supervisor, Grzywinski, decided to let the matter drop and there is no evidence that Dudek, Payne, McGinley or Terwilliger even knew about the incident. Elston also cites to a second

---

[7]When evaluating whether the discipline was comparable, the Court must view the facts as determined by the employer.

[8]The statements in Sebastionelli's blog are inadmissible hearsay. *Barnes Foundation v. Township of Lower Merion*, 982 F. Supp. 970, 996 (E.D. Pa. 1996)

incident in which Lesick was insubordinate to Grzywinski in refusing to fix a particular light, as being a general maintenance issue rather than electrician work. Grzywinski explained that he told Joe Crouse and Jim Veratti, the direct supervisor, about the incident. Lesick was warned or written up, but did not receive "time off for insubordination." Grzywinski Dep. at 30-32. This also fails to qualify as a basis to infer that Elston's discharge was discriminatory. There was no in-person confrontation. Moreover, there is no evidence that Dudek or the other persons involved in Elston's termination even knew about the incident.

In summary, Elston has failed to establish the existence of any valid comparators. There is simply no basis to support an inference of race discrimination. Even considering Dudek as one of the decision-makers, Plaintiff has failed to make out a prima facie case. Accordingly, UPMC is entitled to summary judgment on the claim that Elston was terminated as a result of race discrimination.

> 2. Retaliation

In Count II, Elston alleges that UPMC terminated him in retaliation for complaining about discrimination. Retaliation claims under Title VII are based on a different section of the statute and are analyzed under a different standard. As recently summarized in *Kress v. Birchwood Landscaping*, 2007 WL 800996 (M.D. Pa. 2007):

> Title VII prohibits an employer from "discriminat[ing] against" an employee because the employee "opposed any practice" prohibited by Title VII or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" undertaken pursuant to Title VII, 42 U.S.C. 2000e-3(a); To establish a prima facie case of retaliation in violation of Title VII, the plaintiff must prove three elements by a preponderance of the evidence. First, the plaintiff must show that she engaged in an activity protected under the statute. A protected activity is any activity provided for by either the participation clause or the opposition clause of the statutory language. '[I]nformal protests of discriminatory employment practices, including making complaints to management' " constitute opposition. Whether the employee opposes, or participates in a proceeding against, the employer's activity, the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII. ... Second, the plaintiff must show that she suffered a materially adverse action. ... Finally, the plaintiff must show that the materially adverse decision was causally related to the

13

>protected activity. ("Many may suffer ... harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief.") The causal relationship identifies the "retaliatory animus."

*Id.* at *17 (citations omitted). Retaliation claims follow the familiar *McDonnell-Douglas* burden-shifting approach.

Defendant contends that Plaintiff did not engage in protected activity because he made generalized complaints about unfair treatment which cannot form the basis for a retaliation claim. Defendant further contends that Plaintiff cannot demonstrate a causal connection or that its articulated reason for discharging Elston was pretextual. There is no dispute that the termination of Elston's employment constituted an adverse employment action.

As an initial matter, it is not necessary for a plaintiff to prove the merits of an underlying discrimination complaint in order to invoke the anti-retaliation protection of Title VII. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996). A plaintiff need only have a "good faith, reasonable belief that a violation existed." *Id.* Thus, even though the Court has found that Elston does not have a valid claim under Title VII for race discrimination, he could still prevail on his retaliation claim.

In *Barber v. CSX Distribution Services*, 68 F.3d 694, 702 (3d Cir. 1995), the Court explained that "acceptable forms of protected activity under Title VII's analogous opposition clause include formal charges of discrimination as well as informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges." (citation omitted). The Court looks to the message conveyed, rather than the medium of conveyance. *Id.*

In order for an employee's conduct to constitute a protected activity, "the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII." *Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc.*, 450 F.3d 130, 135-36 (3d Cir. 2006); *see also Fogleman v. Greater Hazleton Health Alliance*, 122 Fed. Appx. 581, 583-84 (3d Cir.2004) (unpublished) ("It thus is not enough for a plaintiff to allege

that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.") Title VII's anti-retaliation provisions protect employees who "oppose employment practices made illegal by Title VII." *Curay-Cramer*, 450 F.3d at 134. Opposition to an illegal employment practice must identify the employer and the practice, at least by context. *Id.* at 135. There is no "hard and fast rule"; instead, the facts must be evaluated in light of the statutory language and legislative intent. *Id.* In *Hamm v. Weyauwega Milk Products, Inc.*, 332 F.3d 1058, 1066 (7th Cir. 2003), the Seventh Circuit explained: "Title VII prohibits an employer from discriminating against an employee 'because he has opposed any practice made an unlawful employment practice by' Title VII. 42 U.S.C. § 2000e-3(a). In other words, Title VII protects an employee from 'retaliation for complaining about the types of discrimination it prohibits.'" (citation omitted).

Elston alleges numerous instances and forms of retaliation. He states that Dudek stopped communicating with him except by email and threatened to take away his secretary. Elston also contends that he complained to Payne in December 2004 about Dudek's "discriminatory and retaliatory conduct," citing Payne Deposition at 23-28. A review of the deposition transcript reflects that Elston complained about numerous aspects of his job, including that Dudek did not understand his needs, that Elston was burned out, that their relationship was down the tubes, that Dudek was not open-minded and challenges without knowing, and that Dudek was resistant to giving him needed support. Elston also complained to Payne that the minority recruitment effort was stalled and was destined to fail. *Id.* Elston contends that Dudek retaliated in response to his contacts with JW Wallace, UPMC's Director of Diversity, in early 2005, which Dudek viewed as "ringing a racial bell that could not be unrung."[9]

On February 22, 2005, Elston learned that Dudek rated him at 2.4 on his performance

---

[9]Plaintiff contends that Dudek retaliated against him after he expressed his opinions with regard to minority recruitment by delaying his salary increase. No reasonable jury could infer that this was actionable retaliation. Dudek had strongly advocated for Elston to receive the raise in October 2004. Moreover, the raise was made retroactive and therefore Elston suffered no materially adverse consequence.

review, as compared to 2.7 the prior year and 3.0 in 2002 and 2003.[10] The next day, Elston sent an email requesting to have a UPMC executive sit in on a discussion of his review and informing Payne that he might go to the EEOC. After not getting a response, on February 24, 2005, Elston sent an email to Payne again asking whether he should proceed with the EEOC. In early March, Elston met with Wallace, the Diversity Director. On March 31, 2005, Elston told Dudek that he was going downtown to file charges against him. On April 5, 2005, two days prior to the April 7 Incident, Elston met with McGinley and told him that he was experiencing discrimination because of his race. On April 6, 2005, Elston told Terwilliger about his meetings with McGinley and Wallace. Terwilliger reacted angrily that Elston should not have gone outside of the department with his complaints.

In summary, a reasonable fact-finder viewing the record in the light most favorable to Plaintiff could conclude that Dudek began treating Elston differently after Elston expressed his views as to minority recruitment. Elston then began to complain about Dudek's alleged retaliatory treatment to all of the individuals (Payne, Terwilliger, McGinley and Dudek) who participated in the decision to terminate his employment. These latter complaints to management constitute "protected activity" because Elston clearly alleged that the treatment to which he was allegedly subjected was based on race. Elston had already been to the EEOC and he informed the UPMC decision-makers of that fact. The termination is clearly a materially adverse employment action.

The most difficult issue is causation. Causation may be established either through temporal proximity where circumstantial evidence suggests a "pattern of antagonism" following the protected conduct. *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 177 (3rd Cir.1997). However, these factors are not dispositive of causation but, rather, represent relevant inquiries in light of the totality of the circumstances. *Id.* A jury could determine that there was a causal relationship. There is certainly temporal proximity, as Elston's complaints to McGinley,

---

[10] It is difficult to show that a performance review has a materially adverse employment impact. *Shesko v. City of Coatesville*, 292 F. Supp.2d 719, 727-28 (E.D. Pa. 2003); *Turner v. Gonzalez*, 421 F.3d 688, 696 (8th Cir. 2005).

Terwilliger and Dudek occurred just days prior to his suspension even though the ultimate termination letter was dated June 3, 2005. Although the occurrence of the April 7 Incident is certainly a strong argument in UPMC's favor, a jury could conclude that the decision-makers' interpretation of and reaction to that incident was influenced by Elston's complaints about discrimination. A plaintiff need not prove that retaliation was the sole reason for the decision, although he must prove that it was a "determinative factor" in the employment decision, in that he would not have been terminated but for his protected activity. *Watson v. SEPTA*, 207 F.3d 207, 215 (3d Cir.2000); *Caver v. City of Trenton*, 420 F.3d 243, 267 (3d Cir.2005).

In summary, Elston can satisfy the elements of a prima facie case for Title VII retaliation. Moreover, viewing the record in the light most favorable to Elston, a jury could conclude that he would not have been terminated but for his complaints to management about alleged discriminatory treatment. Accordingly, the motion for summary judgment will be denied on the Title VII and PHRA retaliation claims.

### 3. Disparate Pay

In Count I, Plaintiff alleges not only wrongful termination, but also pay disparity. Specifically, Plaintiff contends that he was paid less than all of the other, white, maintenance managers because of his race, even though Elston allegedly had greater duties. Defendant contends that summary judgment must be granted because Plaintiff never exhausted the mandatory administrative prerequisites. 42 U.S.C. § 2000e-5(e)(1). Plaintiff's EEOC complaint directly addresses only his termination and does not raise the issue of pay disparity. Plaintiff points to the EEOC Intake Questionnaire prepared by counsel on his behalf, which does state that he was paid less than his white counterparts. Plaintiff argues that he has exhausted his administrative remedies by including this allegation in the Intake Questionnaire because the EEOC had an opportunity to investigate it.

In *Rajoppe v. GMAC Corp. Holding Corp.*, 2007 WL 846671 *7 (E.D. Pa. 2007), the district court explained:

> Courts in this circuit have uniformly held that a plaintiff fails to

> exhaust where he checks off a claim on an intake questionnaire but then omits the claim from the formal EEOC formal charge. *See, e.g., Johnson v. Chase Home Fin.*, 309 F.Supp.2d 667, 672 (E.D.Pa.2004); *Rogan v. Giant Eagle, Inc*., 113 F.Supp.2d 777, 786 (W.D.Pa.2000). The Court agrees with these cases. Intake questionnaires do not serve the same function as the formal charge and are not part of the formal charge. A questionnaire, therefore, does not satisfy the exhaustion requirement where a claim marked off in the questionnaire is omitted from the charge and where the EEOC does not investigate the omitted claim.

This Court also agrees. The pay disparity claim was simply not included as part of the formal charge, and therefore, Elston did not exhaust his administrative remedies. Accordingly, UPMC is entitled to summary judgment on this claim.

Accordingly, Defendant's MOTION FOR SUMMARY JUDGMENT (Document No. 16) is **GRANTED IN PART AND DENIED IN PART**. It is DENIED as to Plaintiff's retaliation claims and GRANTED in all other respects.

Plaintiff shall file a Pretrial Statement on or before November 13, 2007.

Defendant shall file a Pretrial Statement on or before December 3, 2007.

SO ORDERED this 23rd day of October, 2007.

BY THE COURT:

s/ Terrence F. McVerry
United States District Court Judge

cc: Homer L. Walton, Esquire
Email: hwalton@tuckerlaw.com

John J. Myers, Esquire
Email: jmyers@eckertseamans.com
Ryan J. Siciliano, Esquire
Email: rsiciliano@eckertseamans.com