IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TODD ELSTON, | ) | |
| | ) | |
| Plaintiff, | ) | 2:06-cv-329 |
| v. | ) | |
| | ) | |
| | ) | |
| UPMC-PRESBYTERIAN SHADYSIDE, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM ORDER

Now pending before the Court is DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL (*Document No. 76*), to which Plaintiffs have filed a brief in opposition (*Document No.* 77).  Also pending are Plaintiff's MOTION FOR PREJUDGMENT INTEREST (*Document No. 73*), PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND EXPENSES *(Document No. 74),* and PLAINTIFF'S SUPPLEMENTAL REQUEST FOR ATTORNEYS' FEES AND EXPENSES (*Document No. 84*),with exhibits in support.   Defendant UPMC-Presbyterian Shadyside ("UPMC") has filed briefs in response to Plaintiff's fee petition and supplemental petition (*Document Nos. 79, 87*).  The matters are ripe for disposition.

Factual and Procedural Background

Todd Elston began working for UPMC in 1984 as a housekeeper.  He received several promotions and in January 2003, he was promoted to Manager of Engineering and Maintenance, reporting to Ed Dudek. Dudek and Elston's relationship deteriorated in late 2004.  In March 2005, Elston met several times with J.W. Wallace, Senior Director of UPMC's Office of

Diversity, to complain about alleged race discrimination. Plaintiff presented evidence that Dudek viewed the involvement of Wallace as tantamount to "ringing a racial bell that could not be un-rung." On April 5, 2005, Elston met with Ed McGinley, Director of Employee Relations and in-house counsel, regarding alleged discrimination. On April 6, 2005, Jim Terwilliger, Vice President of Operations, met with Elston and Dudek.

On April 7, 2005, an incident occurred which UPMC cited as the basis for its decision to terminate Elston (the "April 7 Incident"). At the end of the workday, Dudek and Elston left work at approximately the same time. There was an encounter between them on the steps of the building which was recorded on videotape. As described by Elston, he was walking beside Dudek and told Dudek that he showed favoritism, had forgotten where he came from, and made Elston "feel like an outside Negro." According to Dudek's written report, he "had a very confrontational incident with Todd that ended with him being very aggressive, verbally abusive, physically threatening and extremely inappropriate." Dudek described Elston as blocking his path, shouting obscenities and waving his finger in Dudek's face.

Michael Payne of Human Resources conducted an investigation. Payne reviewed the video, with Dudek providing commentary. Elston was not given a similar opportunity. On April 28, 2005, Payne submitted his report. The summary states: "The video appears to show that Todd was confrontational and aggressive in his demeanor." Payne expressed his concern that Elston had publicly displayed insubordiantion and recommended: "We need to discuss next steps as a group; however, I believe that we are left with no option but to terminate Todd Elston's employment." Payne then met with Terwilliger, McGinley and Louis Goodman, Vice President of Human Resources. After discussion, the group decided to offer Elston a severance package.

On June 3, 2005, Payne and McGinley met with Elston, informed him that he was being terminated for insubordination due to the April 7 Incident, presented the severance package, and demanded a response within seven days. When Elston did not accept the severance package, Payne sent a letter of termination dated June 3, 2005. Prior to completion of the investigation, on April 12, 2005, Dudek sent an email to Terwilliger which stated: "Thanks for supporting me on this. I really do appreciate it."

On October 23, 2007, prior to trial, the Court issued a Memorandum Order which granted UPMC's motion for summary judgment on all legal theories except for retaliation. In its decision, the Court explained as an initial matter that pursuant to the "subordinate bias" theory, Dudek must be considered to be a decision-maker. In *Abramson v. William Patterson College of New Jersey*, 260 F.3d 265 (3d Cir. 2001), the Court of Appeals held: "it is sufficient if those exhibiting discriminatory animus **influenced or participated in the decision to terminate**." *Id.* at 286 (emphasis added). The term "cat's paw" involves a situation in which an allegedly biased subordinate who lacks decision-making authority "uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006), *cert. dismissed* 127 S. Ct. 1931 (2007) ("*BCI*"). The Memorandum Order stated:

> Applying the *Abramson* standard to the facts of this case, it is apparent that Dudek must be considered to be among the decision-makers. There is substantial evidence that Dudek participated in the investigation of the incident. He submitted a statement and provided oral commentary on the videotape of the April 7 Incident to Payne. Elston, who was not given an opportunity to provide commentary on the videotape, disputes Dudek's description of the incident. Terwilliger stated that he was the ultimate decision-maker, but that he had Dudek's input with regard to that decision. Terwilliger Dep. at 27. In his April 12, 2005 email to Terwilliger, Dudek stated: "Thanks for supporting me on this. I

3

really do appreciate it." In sum, a reasonable jury could conclude that Dudek influenced or participated in the decision to terminate Elston.

The Court determined that summary judgment could not be granted on the retaliation claim. The Court explained that Elston had established a prima facie case, that UPMC had articulated a legitimate, non-discriminatory reason for the discharge (i.e., the April 7 Incident), and that a reasonable jury could conclude that the April 7 Incident was a pretext for retaliation against Elston for making complaints about discrimination. The Court noted the suggestive temporal proximity, as Elston's complaints to Wallace, McGinley, Terwilliger and Dudek occurred just days prior to his suspension, even though the ultimate termination letter was dated June 3, 2005.

The Court concluded:

> Although the occurrence of the April 7 Incident is certainly a strong argument in UPMC's favor, a jury could conclude that the decision-makers' interpretation of and reaction to that incident was influenced by Elston's complaints about discrimination. A plaintiff need not prove that retaliation was the sole reason for the decision, although he must prove that it was a "determinative factor" in the employment decision, in that he would not have been terminated but for his protected activity. *Watson v. SEPTA*, 207 F.3d 207, 215 (3d Cir.2000); *Caver v. City of Trenton*, 420 F.3d 243, 267 (3d Cir.2005). In summary, Elston can satisfy the elements of a prima facie case for Title VII retaliation. Moreover, viewing the record in the light most favorable to Elston, a jury could conclude that he would not have been terminated but for his complaints to management about alleged discriminatory treatment.

Accordingly, a trial was held on a single theory – retaliation. On March 26, 2008, a jury returned a verdict in favor of Elston against UPMC and awarded damages in the amount of $146,050.00.

Motion for Judgment as a Matter of Law

UPMC seeks judgment as a matter of law or a new trial pursuant to Federal Rules of Civil Procedure 50(b) and 59. UPMC recognizes that such relief should be granted sparingly, and that

the Court must draw all reasonable and logical inferences in the nonmovant's favor. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993); *Goodman v. Pa. Turnpike Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002). A Rule 50(b) motion should be granted where "the record is critically deficient of the minimum quantum of evidence" required to support the verdict. *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083 (3d Cir.1995).

UPMC recites a litany of facts that it contends are undisputed to support the proposition that Elston was terminated after an independent investigation of the April 7 Incident. UPMC contends that Plaintiff failed to establish the "causal connection" element of his prima facie case and failed to adduce evidence of pretext. Plaintiff, not surprisingly, contends that he produced sufficient evidence to support the jury's verdict.

The Court's Memorandum Order thoroughly articulated the basis upon which a reasonable jury could find in Plaintiff's favor. In particular, UPMC was on notice prior to trial of the "subordinate bias" theory, that the temporal proximity between Elston's complaints and his termination was unusually suggestive, and that UPMC's reaction to the April 7 Incident would be a jury question.[1] A reasonable jury could have believed that UPMC used the April 7 Incident as a pretext or coverup for terminating Elston's employment in retaliation for his complaints of discrimination, that Elston would not have been fired as a result of the Incident but for those complaints, and that the ensuing investigation was window-dressing or a sham.

UPMC's argument that it performed an investigation and that the actual decision-makers were unbiased largely misses the point. There is no dispute that the April 7 Incident occurred or

---

[1]The jury could have reasonably concluded that the decision to fire Elston occurred in April, even though the official effective date was June 3, 2005, because Elston was suspended from work during the interim.

that Payne conducted an investigation. However, Elston did not simply disagree with UPMC's business judgment regarding the amount of discipline that would have been appropriate. Instead, he contended that UPMC seized on the Incident as a pretext to terminate him in retaliation for complaining to management about what he believed was race discrimination in the maintenance department and that the investigation was part of the coverup. Notably, Dudek stated in an email to Terwilliger dated April 12, 2005 – ***before*** the investigation was completed – : "Thanks for supporting me on this." The videotape of the Incident was played for the jury and the relevant participants testified. The jury could have reasonably concluded that Elston would not have been fired "but for" his complaints about alleged discrimination. While the Court would perhaps reach a different conclusion under a de novo standard of review, it is constrained to construe the record in the light most favorable to Plaintiff. There was sufficient evidence to support the jury's verdict. Payne, Terwilliger, and McGinley were aware of Elston's complaints about discrimination. In addition, under the "cat's paw" subordinate bias theory, even if the jury concluded that the actual decision-makers were unbiased and had no intention to retaliate, the jury could have concluded that they were "duped" by Dudek in a scheme to trigger Elston's discharge. Accordingly, UPMC is not entitled to judgment as a matter of law.

Motion for New Trial

UPMC seeks, in the alternative, a new trial on the basis of an evidentiary ruling.[2] A new trial may be granted if there has been a trial error that within reasonable probability had a substantial influence on the jury verdict. The Court must give proper deference to the jury's role

---

[2]Defendant's Brief did not address its Motion for New Trial.

in determining the facts, but has wide discretion when a party seeks a new trial based on an evidentiary ruling. *See generally Smith v. Elias*, 2007 WL 4209701 *7 (D.V.I. 2007) (citations omitted).

During the trial, Plaintiff's counsel asked Michael Payne why it took from April 7, 2005 until June 3, 2005 to terminate Elston's employment. During this time period, UPMC was preparing a severance offer for Elston, which the Court had earlier ruled was inadmissible.[3] Therefore, Payne was unable to answer this question. However, this exchange does not warrant a new trial. The Court actually sustained UPMC's objection to this question, after entertaining testimony from Ed McGinley outside the presence of the jury. Moreover, the Court issued a cautionary instruction which admonished the jury not to draw an adverse inference against any party based on the lapse of time from April 7 to June 3. Thus, the Court cannot conclude that this ruling was erroneous. Even assuming, arguendo, that there was error, there was no reasonable probability that the error had a substantial influence on the verdict, such that any such error was harmless. *See* Fed. R. Civ. P. 61. Accordingly, a new trial is not warranted.

In accordance with the foregoing, DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL (*Document No. 76*) is **DENIED**.

Petition for Attorneys' Fees and Costs

Plaintiff, as the prevailing party, seeks an award of counsel fees and costs. Under Title VII, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee

---

[3]UPMC agrees that the Court's decision to exclude the severance offer was correct.

(including expert fees) as part of the costs. . . ." Absent special circumstances, a district court must award fees to a prevailing plaintiff. *Independent Federation of Flight Attendants v. Zipes*, 491 U.S. 754, 761 (1989). To "prevail," the plaintiff must succeed on a significant issue in the litigation which achieves some of the benefits sought in bringing suit. *Farrar v. Hobby*, 506 U.S. 103, 109 (1992). Because the jury found in Elston's favor on the retaliation claim and awarded him a substantial amount of backpay, the Court has no difficulty in concluding that Elston is a prevailing party and is entitled to an award of reasonable counsel fees and costs.

As a starting point, the lodestar rate is calculated by multiplying a reasonable hourly rate by the reasonable number of hours expended. *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990). Once the lodestar amount has been calculated, a court has discretion to adjust the fee up or down, based on a variety of factors. *United Auto Workers Local 259 Social Sec. Dept. v. Metro Auto Center*, 501 F.3d 283, 292 (3d Cir. 2007) (discussing factors). The burden to establish reasonableness is on Plaintiff. *Rode,* 892 F.2d at 1183.

Plaintiff's original petition seeks an award of counsel fees in the amount of $231,761.50 plus costs of $8,074.32, for a subtotal of $239,835.82. The supplemental petition seeks additional counsel fees of $21,302.00 and costs of $183.85 incurred in response to the post-trial motions, such that the total amount of attorneys' fees sought is $253,063.50 plus costs of $8,258.17. Defendant contends that the fees requested by Plaintiffs are unreasonable. Specifically, UPMC contends that the fee award should be modified to reflect limited success because UPMC obtained summary judgment on Elston's race discrimination and wage disparity claims. UPMC also contests the number of hours claimed for various tasks, particularly those performed by attorney Frederick Wolfe. The Court will address these contentions seriatim.

1. Hourly Rate

A reasonable hourly rate is to be calculated pursuant to the "prevailing market rate" in the "relevant community." This circuit follows the "forum rate rule," in which the relevant community is generally the forum in which the suit was filed. *Interfaith Community Organization v. Honeywell Int'l, Inc.*, 426 F.3d 694, 703-05 (3d Cir. 2005); *Public Interest Research Group of New Jersey, Inc. v. Windall*, 51 F.3d 1179, 1187 (3d Cir. 1995). The relevant rate is to be calculated at the time of the fee petition, rather than the rate at the time the services were actually performed. *Lanni v. New Jersey*, 259 F.3d 146, 149 (3d Cir. 2001). The Court must base its decision on the record, rather than a generalized sense of what is customary or proper. *Coleman v. Kaye*, 87 F.3d 1491, 1510 (3d Cir. 1996). The rate should take into account prevailing counsel's skill and experience, the nature and complexity of the matter at issue, and should be evaluated with reference to the rates charged by comparable practitioners in the community. *Rode*, 892 F.2d at 1183. A reasonable fee is sufficient to attract competent counsel, but does not produce a windfall for the attorneys. *Pub. Interest Research Group*, 51 F.3d at 1185. Routine tasks performed by senior partners at large firms should not be billed at their usual rates. *Ursic v. Bethlehem Mines*, 719 F.2d 670, 677 (3d Cir. 1983) (analogizing that Michaelangelo should not charge Sistine Chapel rates for painting a farmer's barn).

Defendant does not contest any of the hourly rates claimed by Plaintiff. However, there is one dispute that tangentially affects the hourly rate. Defendant challenges many of the hours claimed by attorney Wolfe for performing legal research and other delegable tasks and argues that it should not have to pay for two senior attorneys to review each others' work. UPMC seeks to strike the hours billed by Wolfe on such tasks entirely. Plaintiff replies that, to the extent

UPMC's arguments are meritorious, the better remedy is to credit Wolfe's time at an associate's hourly rate. Plaintiff's Reply at 10 n.5. The Court agrees with Plaintiff because the work performed by Wolfe was clearly helpful to the results obtained by Elston. In this case, UPMC has not challenged attorney Leah's rate of $205 per hour as unreasonable for an associate attorney. Therefore, work performed by Wolfe that the Court determines could have been more appropriately performed by a less-experienced attorney will be credited at a $205 hourly rate.

2. Hours Claimed

District courts are instructed to conduct a "thorough and searching analysis" of the fee application. *Interfaith Community*, 426 F.3d at 703 n.5. A prevailing party may only recover for time reasonably expended and the Court must exclude time that was excessive, redundant or unnecessary. *Id.* at 711. As the hourly rate demanded goes up, there should be a corresponding decrease in the amount of time required to accomplish necessary tasks, due to counsel's experience and expertise. *Ursic*, 719 F.2d at 677. Time that would not be billed to a client cannot be imposed on an adversary. *Windall*, 51 F.3d at 1188. The Court cannot reduce an award sua sponte. Rather, the opposing party must make specific objections. *Interfaith Community*, 426 F.3d at 711. Once the opposing party does so, the burden shifts back to the party seeking fees to justify the size of its request. *Id.*

In this case, UPMC has raised several specific objections that various time entries are duplicative and unreasonable. Plaintiffs have responded to each objection. The Court will address each issue seriatim.

> a.   12.0 hours for "waiting" for a jury verdict

Defendant contends, without citation to authority, that it should not be required to pay for the time spent by attorney Walton while waiting for the jury verdict. Plaintiff, in response, argues that Defendant has not met its burden to overcome the presumption of reasonableness, citing *AT & T Corp. Securities Litigation*, 455 F.3d 160, 171 (3d Cir. 2006).

This objection is granted in part. As an initial matter, Plaintiff's citation to *AT & T* is unavailing because the Court of Appeals cautioned district courts to refrain from giving the presumption of reasonableness too much weight. *Id.* at 171 n.7. Moreover, that case involved the application of the *Girsh* factors, as opposed to the factual objection to a specific line item of the Matter Timekeeper Detail at issue here. Plaintiff has equally failed to cite authority in support of an award of counsel fees while waiting for the jury. The Court directs the parties to *Jordan v. City of Cleveland*, 464 F.3d 584, 602 (6th Cir. 2006), in which the Court of Appeals for the Sixth Circuit held that the exclusion of 64 hours of the 68 hours that the prevailing employee's attorney spent waiting for the jury verdict was warranted. *But see Roberts v. Interstate Distributor Co.*, 242 F.Supp.2d 850 (D. Or. 2002) (awarding fees under state law for 3.5 hours spent waiting where lawyer was from out of town).

Walton's office is located within a fifteen minute walk of the courthouse, and in light of the improvements in electronic communication devices, he could have engaged in productive work on behalf of other clients while "waiting" for the verdict. It is not reasonable to require UPMC to pay for approximately a day and a half of Plaintiff's counsel's time for this voluntary idleness. The Court will award 2.0 hours to reflect the time legitimately incurred in response to the two questions posed by the jury during its deliberations. The Court will reduce Walton's

compensable verdict waiting time by 10.0 hours.

> b.   *Tasks performed by attorney Wolfe*

UPMC objects generally to the participation of two senior attorneys in this case. UPMC does not contest the hours spent by Walton but seeks to exclude the time recorded by attorney Wolfe on the following days: November 12 and December 10, 2007, January 21, 22, 23 and 28, February 6, 7, 8, 12, 14, 15, 21, 22, 25-29, March 3, 4, 6, 7, 12-14, 17-20, 24-28 and April 1, 2008. UPMC asks the Court to deduct these hours from the lodestar calculation entirely. As explained above, the Court disagrees with UPMC's requested relief and concludes that the more appropriate approach is to award these hours at a reasonable associate rate of $205/hour.

The gravamen of UPMC's contention is that Walton and Wolfe spent an unreasonable time reviewing each others' work, and that the participation of two senior attorneys was duplicative. UPMC further contends that Wolfe performed tasks, such as legal research, that were more appropriately delegated to the associate attorneys involved in this case, Leah and Koop. Plaintiff contends that Wolfe's claimed hours were not duplicative, but rather, that he and Walton efficiently allocated the work amongst themselves. Plaintiff further contends that UPMC is unfairly characterizing certain tasks performed by Wolfe as "legal research" by omitting the full description of the entries in the Matter Timekeeper Detail. Plaintiff argues that drafting jury instructions and voir dire and responding to motions in limine necessitated a senior attorney's work experience and that the number of hours required to perform those tasks reflects Wolfe's experience. Finally, Plaintiff accurately points out that UPMC had two lawyers at the pretrial conference, jury selection and throughout the entire trial.

The Court has thoroughly reviewed the Matter Timekeeper Detail entries at issue. It is

apparent that attorney Walton was the lead counsel on the case and that attorney Wolfe was brought in to assist Walton at the time of trial preparation. Plaintiff concedes that the work completed by Wolfe was *for* Walton and that Wolfe was brought into the case to assist Walton. Plaintiff's Reply at 8 (emphasis in original). Thus, the case cited by Plaintiff, *Ferczak v. Woodruff Family Services*, 2007 WL 951439 (W.D. Pa. 2007) (which rejected a request to reduce lead counsel's hourly rate), is distinguishable.

The Court agrees with Plaintiff that all of the hours claimed by Wolfe on this case were reasonable and necessary. It is appropriate for multiple attorneys to allocate tasks, to strategize and to develop tactics as part of a team. However, the Court agrees with Defendant that it is not reasonable to require it to pay the hourly rate of two senior counsel on this case, particularly when attorney Wolfe was brought in to assist Walton with tasks that could have been performed by a less experienced lawyer. This case was not unduly complex and had been reduced to a single retaliation claim prior to Wolfe's involvement. In particular, the Court of Appeals for the Third Circuit had Model Jury Instructions developed to streamline and simplify that very task. The Court is unable to determine on this record that Wolfe's expertise and experience resulted in substantially less time for the performance of any particular task. Thus, the Court will award counsel fees for all 141.6 hours claimed by Wolfe, but at a rate of $205 per hour.

    c. *$21,302 in counsel fees to prepare responses to post-trial motions and fee petition*

Plaintiff filed a supplemental fee petition to recover the costs and fees related to post-trial motions and preparation of the fee petition. UPMC does not point to a specific line item, but argues generally that the fees should be significantly reduced because the time claimed was too

long. UPMC does not challenge the supplemental costs claimed by Elston. This objection is denied, as Plaintiff is entitled to recover such fees and costs, Defendant has not articulated a specific objection, and the time claimed does not appear to be unreasonable. As explained above, Wolfe's work on the post-trial motions will be credited at $205 per hour.

3.  Lodestar Calculation

The following table sets forth the rate structure and number of hours on this case claimed by Plaintiff in the Supplemental Petition:

| **Timekeeper** | **# Hours** | **2008 Rate** | **Net Amount Claimed** |
|---|---|---|---|
| Homer L. Walton | 740.4[4] | $260 per hour | $192,504.00 |
| Frederick J. Wolfe | 141.6 | $260 per hour | $ 36,752.00 |
| Michelle L. Kopinski | 7.6 | $270 per hour | $  2,052.00 |
| Scott R. Leah | 22.5 | $205 per hour | $  4,602.50 |
| Katherine E. Koop | 50.6 | $135 per hour | $  6,831.00 |
| S. Ross Green | 2.4 | $160 per hour | $     384.00 |
| Audrey C. Waldock, Paralegal | 96.9[5] | $105 per hour | $  9,538.00 |
| Earl L. Cromer, Paralegal | 4.0 | $100 per hour | $     400.00 |

---

[4] Plaintiff's Supplemental Petition states that Elston is claiming 738 hours for Walton. The Court construes this as a typographical error because the net amount claimed of $192,504 is equivalent to 740.4 hours at $260/hour, which is consistent with the underlying documentation submitted by Plaintiff.

[5] Plaintiff's Supplemental Petition also contains mathematical errors in the amounts claimed for Leah and Waldock. In each case, the Court has awarded the net amounts claimed by Plaintiff for work performed by Leah ($4,602.50) and Waldock ($9,538.00) respectively, which are lower than the amounts calculated by multiplying their time by their hourly rate.

As a result of Defendant's specific objections, the Court has reduced Walton's time by 10.0 hours and has reduced Wolfe's hourly rate from $260 to $205 per hour. Thus, the lodestar calculation results in counsel fees of $242,739.50. After adding $8,258.17 for costs, to which Defendant did not raise any specific objections, Plaintiff would be entitled to a lodestar amount of $250,997.67.

    4.       Evaluation of Other Factors/Adjustment of Lodestar

UPMC's primary argument is that the fees and costs claimed by Plaintiff should be significantly reduced to reflect his limited success in this litigation. In *Washington v. Philadelphia County Court of Common Pleas*, 89 F.3d 1031, 1040 (3d Cir.1996), the Court of Appeals for the Third Circuit held that a "court may not diminish counsel fees in a section 1983 action to maintain some ratio between the fees and the damages awarded." Similarly, in *United Auto Workers*, the Court held that proportionality is not a permissible "reasonableness" factor. However, as expressly permitted by the United States Supreme Court, the Court may adjust the award due to a prevailing party's limited success. *Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983) ("A reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole."). *See Watson v. SEPTA*, 207 F.3d 207, 224-25 (3d Cir. 2000).

UPMC contends that both counsel fees and costs should be reduced by two-thirds because Elston's race discrimination and wage disparity claims were denied at the summary judgment stage and Elston prevailed only on his retaliation claim. UPMC also contends that Elston's success was limited in that he indicated he would seek over $1,000,000 in damages, but was

awarded less than $150,000, and because the jury refused to award any front pay, compensatory damages, or punitive damages, and Elston did not obtain any equitable relief.

Plaintiff, in response, argues that the Court may not simply reduce the award by two-thirds to mirror the ratio of successful claims. *Hensley*, 461 U.S at 435 n. 11. Plaintiff contends that he achieved substantial success by receiving his full backpay and that it was not necessary for him to recover every possible dollar sought. Plaintiff observes that the wage disparity claim was not a separate count in the Complaint. Plaintiff also contends that his legal theories arose from the same core of facts and were interrelated. Finally, Plaintiff points out that 62.3% of the attorney time was incurred after summary judgment.

Both parties are partially correct. The Court agrees with Plaintiff that some of the work performed on the race discrimination claim was intertwined with the retaliation claim. To make out a prima facie case of retaliation, Elston needed to prove that he engaged in "protected activity," which, in turn, required him to show that his complaints to management about race discrimination were reasonable. On the other hand, the Court agrees with Defendant that the wage disparity allegations were separate and distinct from the retaliation claim such that work on that theory should not be compensable. UPMC points out that Plaintiff identified ten co-workers who were alleged comparators for the unsuccessful wage disparity claim and that substantial time was devoted to written discovery, depositions and summary judgment briefing on that issue. The Court determined that the wage disparity claim was not meritorious and this work did not advance Elston's successful retaliation claim. Further, UPMC was successful in defeating Elston's claims for front pay, compensatory damages, punitive damages and equitable relief, all of which were sought throughout the litigation.

The Court concludes that given the entirety of the circumstances of this case, the lodestar amount should be adjusted downward by 30% to reflect Plaintiff's limited success. The work performed by Plaintiff's attorneys was professional and competent and Plaintiff was certainly a prevailing party. However, a significant portion of that work was not necessary or relevant to the narrow victory that Elston achieved – the award of backpay on his retaliation claim. Even after the reductions set forth above, the award remains substantial and the Court concludes that the award, as adjusted, is reasonable.

Accordingly, PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND EXPENSES *(Document No. 74),* and PLAINTIFF'S SUPPLEMENTAL REQUEST FOR ATTORNEYS' FEES AND EXPENSES (*Document No. 84*) are **GRANTED IN PART AND DENIED IN PART**. Defendant shall pay counsel fees and costs to the Plaintiff in the total amount of $175,698.37.

Motion for Prejudgment Interest

Plaintiff seeks an award of prejudgment interest of $9,503.20 as part of his backpay remedy, citing *Loeffler v. Frank*, 486 U.S. 549, 557 (1988). Plaintiff has calculated the amount of prejudgment interest due by using the post-judgment interest statute, 28 U.S.C. § 6621. Defendant does not oppose this motion. Accordingly, Plaintiff's MOTION FOR PREJUDGMENT INTEREST (*Document No. 73*) is **GRANTED** and Defendant shall pay Plaintiff prejudgment interest in the amount of $9,503.20.

SO ORDERED this 10th day of June, 2008.

BY THE COURT:

s/  Terrence F. McVerry
United States District Court Judge

cc: Homer L. Walton, Esquire
Email: hwalton@tuckerlaw.com
Frederick J. Wolfe
Email: fwolfe@tuckerlaw.com

John J. Myers, Esquire
Email: jmyers@eckertseamans.com
Ryan J. Siciliano, Esquire
Email: rsiciliano@eckertseamans.com
Allison Feldstein, Esquire
Email: afeldstein@eckertseamans.com